Good morning, Your Honors. William Nathan Candy for Appellant Dereck Seltzer. Mr. Seltzer is in the courtroom with us today. Very well. I'm going to try to watch the clock and reserve a couple minutes for rebuttal. We're here today on a grant of summary judgment for defendants in the entirety of the case. I'm happy to answer questions about anything, but I will focus my remarks on the copyright issues and the question of whether defendants' use of Mr. Seltzer's image scream icon was a fair use. The image in question, the plaintiff's image, the copyrighted work, is a close-up image of a face cropped very tightly in some kind of extreme emotion. With the red cross over it. We know what it looks like. We know. We've seen it. Right. Well, the plaintiff's work didn't have the red cross, but yes. So in analyzing whether the use made of it was a fair use or not, I think the first question to be addressed is a threshold question as to whether the use made of it was a use such as the uses listed in 107, what's sometimes called the preamble. And that list of criticism, comment, news reporting, et cetera, is often referred to as illustrative but not limitative, but we do think it is illustrative. And the principle it is illustrating is that each of these types of uses, which the statute says is what qualifies for fair use, is the type of use that has to, in reasonable circumstances, use a preexisting work in order to do its job. News reporting may very well have to take at least some part of a copyrighted work or an image in order to report. Certainly criticism might have to quote from the works it's criticizing. And the same with scholarship and research. But why doesn't the way in which it was used, plus the addition of the red cross painted over, why doesn't that constitute a transformative use? For a couple of reasons. First of all, we think it's just, even if you just look at it generally, not enough. The underlying work, Mr. Seltzer's work, is perfectly recognizable despite the changes made to it. There's a big red cross, but it goes down the front of the nose and across the forehead, and it's not the part of, you know, if this was a person we knew, we'd certainly recognize that it was, say, you know, Mr. Obama. But more fundamentally, a transformative use cannot simply mean changing something, just more change and more different. In fact, the Campbell case which introduced this talks about transformative works and transformative uses doesn't just talk about a transformed work. Part of the reason for that is the right to make a transformed work is an exclusive right reserved to the copyright holder as a derivative work. It's part of the definition of what a derivative work is, which is, you know, a right to recast or transform or adopt the copyrighted work in any form. So we can see that at least some transformations have to be not fair uses, but infringements. We can also see from the case law that you can change a work quite a bit and still not have it be a transformative use. A phrase that's taken from Campbell that's often referred to, it talks about change in expression, meaning or message. But, you know, to cite some examples, we have the Castle Rock case in which the defendants created a quiz book about Seinfeld television show. Obviously, this is a very different expression, a different medium. It's, you know, multiple choice quizzes instead of television. This was not found to be a transformative use. The Dr. Seuss case certainly had added meaning and message. I mean, there's nothing in the original Dr. Seuss works that speak about O.J. Simpson or murder or celebrity or justice. This was not a transformative use because it was just added on top. Does the fact that it was originally street art play a role in this analysis? No, it doesn't. What was the commercial aspect of the work that we're talking about then? The commercial aspect of Mr. Seltzer's work? Well, he has displayed it in galleries and made posters of it and stickers of it and put it on skateboards and he has licensed it for music video. And it's a work which he continues to return to. He has made many different forms of this and continues to use it as a display. In fact, it identifies itself. How does this use infringe on that? Because it supplants the work in a traditional potential market for the work or for one of its derivatives. I mean, obviously, it infringes the rights of the production and distribution and display and the right to make the derivative work. But in terms of the market, it is an existing traditional market to sell or to purchase art and other materials for use in the type of production that is done here or other theatrical productions or motion picture productions. In this case, the defendants, in fact, expected and instructed and in other cases obtained clearances for the art they used in the other videos or the other songs. There's certainly departments and theatrical production offices and motion picture production offices devoted to obtaining these kind of clearances. From the seller's side, that's the buyer's side. From the seller's side, Mr. Seltzer had indeed licensed this for another music video. And he, you know, is not nearly as well-known at this point in his career as Green Day is. So he's working to build his career. And at some point, he may well have the chance to market it further and for the type of exposure that Green Day took for themselves. What's the last case you want me to read before I make a decision on this issue? I think Campbell, the Dr. Seuss case as well, Castle Rock is interesting for talking about the interface between derivative works and transformation in the fair use context. But I think Campbell, which is a little bit difficult to parse, but I think it actually sets forth our argument in there. Do issues like this ordinarily go to a jury? I think issues like this often go to a jury. I think just in terms of the numbers, they used to almost always go to the jury. And there has been a movement. It's, you know, this court has held that it can be appropriate to. So are you pursuing the opportunity to take this to a jury, or are you arguing that as a matter of law, you win? Well, if as a matter of law, we win the fair use question, it still needs to go back to the jury for other matters, for the damages. We think as a matter of law, this is not a transformative use. But we do think to the extent that it's close, there's questions of fact for the jury to find about what, you know, if it truly, you know, if the court feels that it's enough change in meaning to add a comment on religious hypocrisy to this preexisting work, it's still a question for the jury to decide whether that, in fact, is what happened with the addition of the cross and the marginal activity. Transformative is a pretty slippery concept. It is. And it has caused a lot of slipperiness in the cases. And if you look for language in the cases, you can find things which support almost any holding on any of the factors, but particularly in the transformativeness. I think the holdings are a little bit more reconcilable with each other. We think, in fact, what Campbell sets forth and what the cases support, by and large, is that a transformative work in the fair use context is a use in which the changes made to the copyrighted work result in a new use which, first of all, needs a justification for using that particular copyrighted work. And secondly, results in a use which doesn't supplant or supersede the copyrighted work in a reasonable potential market or actual market for either the work itself or derivatives of that work. Now, as I recall, this is about a four and a half minute exposure during the concert by Green Day, and it's one piece of a larger backdrop against which the band plays. What is the negative commercial impact on this work as you see it? It diminishes, potentially anyway, Mr. Seltzer's ability to license it for the same purposes. It also prevents Mr. Seltzer from choosing when to enter into this market. His work, if he continues to grow as an artist and build his reputation, his work will be more valuable if he chooses to enter this market later. And one of the choices that is granted a copyright holder, it's a monopoly choice. The Constitution could have been written like the Takings Clause. It could have been you cannot use a creator's or author's work without just compensation. That's not how it's written. It grants a monopoly of control for a limited term of the copyrightable portion of the work. Here, obviously, I think it would easily have been possible for the defendants to create their own work of a face and extremity because there's no need to use this work at all. I mean, their claim is their video has nothing to do with the content of Mr. Seltzer's work. They completely changed it. It's part of their transformative argument, but it cuts both ways. Does the fact that this was street art have anything to do with the resolution of this issue? I don't see how it has anything to do with the resolution of the fair use issue or, for that matter, the other copyright defenses asserted by defendants. I mean, certainly, there's lots of street art. There's, you know, billboards and, you know, posters and the fact that it's posted on. You see a lot of, for instance, movie posters posted all around town, you know, slapped up on construction sites. We have plenty of cases in which, I'm sure they didn't face the issue, but where movie posters are the subject of copyright claims and infringement. Counselor, you're down to two and a half minutes. If you wish to reserve, you may do so. I'll reserve the rest of my time, thank you. Very well. Green Day is well represented. I see three names listed on the docket sheet. Good morning, and may it please the Court. I'm Peter Anderson, and I represent the Green Day defendants. With me are Bruce Isaacs for Roger Staub and Lee Brenner for Performance Environment Design Group. They have kindly ceded to me the third portion of our 15 minutes. So you have the whole 15 minutes? I do, for better or worse, yes. Very well. You may proceed, Counselor. When Roger Staub created the video backdrop, he did not use Mr. Seltzer's scream icon in its original form. In fact, scream icon in its original form would not have worked. Because what Roger Staub had done, and he was inspired, as he testified, to create a video backdrop whose theme was street art and dealt with this issue of religious hypocrisy and violence. He testified that he had taken this photograph of street art, and that when he was in the process of creating this video backdrop, he remembered the photograph, and it captured the feeling of urban art. That's what his testimony was. That's why he used that photograph. The feeling of urban art does not derive from scream icon in its original form. If your honors care to compare the supplemental excerpts at pages 203 and 265, you'll see there's a stark difference between scream icon in its original form and the street art that was photographed. What's the difference? The street art that was photographed is a torn, weathered piece of art, street art, that has graffiti marked across it that has suffered the ravages of time. It is not, and that's what made it usable for this. Now this is important. It is important for the fair use defense, because the fact that this was street art establishes, first of all, confirms on the first factor of the purpose and character of the use, that Staub was doing something different than what Mr. Seltzer had done. Mr. Seltzer's original image would not have worked. Mr. Roger Staub was working with street art because as an artistic choice, he decided to use his own photograph of street art. Second, on the second factor of the nature of the plaintiff's work, Staub's use of street art confirms that this was not only a published piece of work, but it was street art, which is, you know, the court has this sort of spectrum of an unpublished work being subject to the strictest application of the fair use defense. This is the complete antithesis of an unpublished work. This is street art. This is a situation. It's not only street art. It's used for other purposes, is it not? Mr. Seltzer uses it for many things. He uses it for many things, Your Honor. Well, at least these are the things he has used it for. He has put it on his skateboard. He has given it to people knowing that they were posting it as street art and continued to give it to them. And he has used it in paintings. And those are the uses that he testified to. Now, counsel says that we foreclosed a market where he could license it for use in a concert. And actually, Mr. Seltzer testified in his own words. He had absolutely no desire for this work to be used in concerts. He had absolutely no desire for it to be used in the way that the defendants used it. That is not- That means it's fair for defendants to use it? No, it means that we're not impacting on the transformative use, on his right to use it in that way. We did not sell stickers. We didn't put it on merchandise. We didn't put it in paintings. We didn't do any of the things that Mr. Seltzer does. One of the criteria for fair use is the effect on the market value. And- But that's not the basis for the district court's opinion, is it? It is, Your Honor. The district court found that factor to cut in our favor because we weren't making a use that was a use that Mr. Seltzer wanted to pursue. He foreclosed it. He testified, I have absolutely no desire to use it in the way the defendants used it. That's not quite the same thing. He says he doesn't want to use it the way they've used it with the big cross on it and so forth in the context of a song about religion or I'm not gonna get into the details of that. That doesn't mean that he precluded the possibility of using it in a concert context as a backdrop, as a music video at all, did he? Well, Your Honor, actually, it's a little bit different. And his principal testimony is at 188 of the supplemental excerpts of record. In the reply brief, they point out that Mr. Seltzer is against commercialism. He's against the media use of his art. And he testified not only that, I mean, you're absolutely right. He testified he was horrified that there was a cross on it. But he also testified that it's been used in a commercial worldwide tour for a band. I never intended for the work to be used like that. There are different aspects here. One aspect is that he doesn't like the fact that it's associated with religion, that the transformative use added a cross. He made that very clear. But he also testified that he didn't like that commercial use. He talked about how he was against commercialism. He didn't like art being used for commercial purposes. So it was both aspects of it. I just don't see where that leads. If an artist doesn't want his work to be used for commercial purposes, does that give carte blanche to anybody else decides to use it for commercial purposes because the artist wouldn't use it that way?  It's a four-factor test, Your Honor. And that one factor alone would not make a difference. In this court's decision just a few months ago in Manja, where the photographs were unpublished confidential photographs of two celebrities. And they didn't want the world to know that they had gotten married. These photographs were of their wedding. And the court ruled that that was not a fair use. And in that situation, they had refused. They kept these things hidden. So they weren't trying to exploit them. Now the court did rule that there was a possibility they might change their mind. But the operative and the important fact about Manja was that they were unpublished photographs. They were used in their entirety and they were creative works. And they had this potential future market. One has to look at all of the circumstances. And that gets back to one of the reasons that the transformative use here of street art is important because that's another factor. It strikes me that all of this ought to be the subject, as we say in the vernacular, the subject of a genuine issue of material fact. That it ought to go to a trier of fact and not be decided on summary judgment. What am I missing there? I mean, you're all over the lot. This side, that side, there's lots of arguments. But that seems to me the traditional stuff of which jury arguments and jury cases are made. Well, Your Honor, the reason why a trial wasn't necessary here was because of Plaintiff's own admissions. He admitted the transformative nature of the use. He admitted that the addition of the cross changed the meaning of the work completely. He admitted- I'm hung up there, too. I don't understand how it changed. I mean, the icon shows, this screaming icon, it's called, it's just anguish. It's not a pastoral scene. I don't think street art that was a pastoral scene would have worked or would have been consistent with the intent of the designer. It seems to me it actually adopted exactly what the work was trying to reflect. Well, Your Honor, first of all, scream icon, if you actually look at the original work, is a fanged face. I don't know if it's a vampire. Second, the plaintiff testified that the point of scream icon was skateboard culture and other things having nothing to do with religion. Now, religion doesn't change anything. Suppose you describe it as anguish. The fact that you project the anguish into the context of religion hasn't transformed the original work of displaying anguish. My visual aid, this case, immediately made me think of the scream. And it turns out that up on the sixth floor of this building, somebody has an inflatable scream. So now everybody knows what we're talking about. Assume for a moment this was covered by copyright. Would you transform it if you used it in this fashion and put a cross over it? The meaning would be different. Because now you don't know why the scream. And that would be fair use, that this image could be used in this way? That would be one of the facts. And actually, I asked Mr. Seltzer about the scream and whether it was inspired by the scream. And he said, I don't recall, which was the answer we got 165 times, I don't recall. It depends on all the facts and circumstances. The scream, the Munch painting, does not tell you why he is in anguish. There is no explanation. Does it transform it to give a reason? To put a cross there, and that's enough to make it transformative? So by your theory, if this were protected by copyright, somebody else could come along and use it in this fashion. And by sticking a cross over it, that would be sufficiently transformative to make it fair use. There were other changes as well, but yes. He found this painting sold for $120 million, well known. And I suspect it's not covered by copyright today, it was a long time ago. But if it were, I mean, that seems to be hard to believe, that that would become fair use simply by projecting the scream into the specific context. If it could be somebody who doesn't like a particular sports team, the New York Yankees, projecting the New York Yankees on this would suddenly make it fair use because you're taking the context of the art, or taking the art and putting it into a specific context. Why is that a fair use? Well, Your Honor, for example, in Mattel versus Walking Mountain, this court held that taking a Barbie doll, which was a copyrighted image, and a copyrighted sculptural work, and putting it in a blender, was a fair use, was transformative. That was very much a non-Barbie, not a pro-Barbie statement. Well, but the part of the- Here it seems like the impression left by the artist, that is of what I'll call anguish to separate it from scream, is exactly being adopted and being projected in the context of religion, or the song, which has an anti-religious message of sorts. What's changed? Well, first of all, the song isn't anti-religion. That's an oversimplification. But what has changed is there is nothing, well, actually the evidence speaks for itself, Mr. Seltzer testified, that's his testimony, that this changed the meaning of his work. And that was important to the court below when it ruled. Mr. Seltzer himself testified it changed. So if I take a piece of art and manipulate it in a way that horrifies the artist, it's fair game. Well, no, that's a different question. He did say he was horrified, and they made the argument. But separate from being horrified, he testified this changed the meaning of his art. I don't know if Mook was religious or not. Suppose he was. In that era, he probably professed some form of religion, although as an artist, who knows? But if you slap a cross over it, the fact that he doesn't want to make that statement about religion would be sufficiently transformative to make the iconic image fair game? If Your Honor, as I recall that painting, it's also a bleak background. It's very Norwegian. It looks like the human condition, anguish at the human condition. If someone changes that, to change the meaning by putting a cross, I think we can all agree that putting a red cross, a blood red cross, as they described it in their opening brief, on top of an image changes the meaning. Attributes this anguish, not generally to whatever it might be, in Scream Icon, it may be because the guy has fangs. I don't know. But this changes the meaning, and it's only one part of it. Again, we're talking about a video backdrop that had other images that clearly associated religion with, unfortunately, violence. There's one poster of a gentleman with a cross attacking someone with a sickle. I mean, this is not limited to Christianity. It is a general point that sometimes people hide in the cloak of religion and commit violence. So I thought it was an Islamic symbol, the crescent and the- You're right, Your Honor. Thank you for correcting me. What's your best case that you want me to take a look at before I decide this issue? Well, I think Blansky-Kuhn's is good, the Second Circuit decision. There, I mean, one could describe this, this four-minute video, as a video collage. And in Blansky versus Kuhn's, the Second Circuit dealt with a painting that was a collage, and it included a photograph. The Second Circuit also has the Court of Appeals decision in the Bill Graham case, where the plaintiff made the exact point that the plaintiff's making here, which is that the fair use must target the work. And Bill Graham rejected that. I'm concerned about the attorney's fees also. Why are they justifiable in this case? The district court took a look at this and said, well, they didn't have an invidious motive, which are the second and third factors. And why is this necessarily objectively unreasonable? It sounds to me like this is the subject of a lot of debate. Well, I think what the, first of all, the court weighed other factors as well. Right. But on that fact in particular, what the court focused on was that Mr. Seltzer was at the same time that he was testifying that this use changed the meaning of his work, he was taking the position as not transformative. Those positions aren't reconcilable. And the district court, as this court said in Maljack, has discretion to decide what is objectively reasonable and not. What is our role when we look at that? Abusive discretion, Your Honor, I believe. But is there a tradition of being very deferential in copyright attorney fee cases, or? Absolutely, Your Honor. In Range Rover, the court stated that this court exercise allows the district court wide discretion in deciding the equitable issue of whether to award attorney's fees. Just briefly on the Lanham Act, the evidence was that Mr. Seltzer had never used this as a mark. Excuse me. In the reply, they cite Rome Creative Arts, a district court decision. That decision actually has been widely criticized. And some of that criticism is in Lay v. Warner Brothers, 10 F 2nd, 1371 at 1380. Has that case been cited by one side or another? I'm sorry? Is this a cited case? Is it a case that's? It came up. No, it's not a cited case. In other words, you're bringing it up for the first time. There's no 28-J letter. I am bringing it up for the first time. It is an existing case. It's not new authority. And it is cited because of a point made in the reply brief, a new case that was mentioned in the reply brief. All right, counsel. Our rules require that you bring this case to our attention in a 28-J letter, which I gather we have not received. Would you, before leaving the chambers today, please see the deputy clerk and arrange to have copies of the citation made to, for Mr. Canby, and three copies for the court? Absolutely, your honor, and I apologize. I thought that would be sort of a sure reply if I were to do that, since it's not a new case. It's just a case that challenges the case they cited. Very well. The other point I want to- Counsel, I'm afraid your time has now expired. Thank you. Mr. Canby, you have some reserve time. Thank you, your honor. To quickly address some points, a couple of factual points that I think were worth clarifying, while Mr. Staub did create the video backdrop, he obtained, he took a photograph of Screen Icon from the street. And the photograph had many posters on it, and it was of the street. Before he used it, he cropped out everything except the poster of Screen Icon that he found there. It's true, it was a little bit weathered, but that doesn't make it any less a version of Screen Icon. It's sort of nature's derivative work. The Screen Icon, in the use of the video, is not animated. I mean, the light kind of changes, but it and the cross stay as the by far central focal piece. And the other activity on the sides are around the margins. They don't impinge over the image. And the other activities are much smaller and would be much harder to see in the concert arena, for one thing. I'd like to address just briefly, defendants mentioned that there's a spectrum in the second factor, between published and unpublished work. We think that that is not the correct analysis. We think you look to that question only where it makes a difference. There are some cases, and this idea came from the Harper and Row case, in which the Nation Magazine published big excerpts of Gerald Ford's memoirs before they were published, and thereby usurped much of the commercial news value. That's in a factual recording setting. Here, there's no particular difference in the value, whether it's been published or not. I asked the other side what case they really like a lot, and that's Blanche versus Coons. It's cited all over their brief, but you don't refer to it anywhere, either in your opening or your reply brief. Do you have anything you want to tell us about Blanche versus Coons and all the cases that are cited in that case? Yeah, Blanche versus Coons, it's fairly, it's sort of at the edge of what's found to be fair use. But there's significant differences. In that case, the artist's defendant used a fashion photograph and chopped it. Just used the lower part of the leg and the feet, turned them upside down. You actually used it in a collage with other feet and other images. And used it for the purpose of commenting on, in a visual fashion, fashion and advertising and sort of the glamour industry. And it's reasonable to think that in order to make a visual comment on that with any kind of force, you may have to quote it. And this is, in essence, a quote, and it's found that he did not take more than he needed to. Do you have anything you want to add on the attorney's fees issue? Yes, I think this was a mistake. I think the district court found that Mr. Seltzer was objectively unreasonable and factually unreasonable and contrary to the law on point. But his examples simply referred to his own decisions in the four factors and case law which supported it. But the case law wasn't such that if you read this case, you know that this is, that you will lose. I mean, it's not easy to decide beforehand whether the Red Cross is transformative necessarily. It's just not objectively unreasonable. And while there is discretion, it is cabined by the sense that you can't say something is, you don't have all the discretion in the world to say something that's objectively unreasonable. There has to be something objective about it. All right, thank you, Counselor. Your time has expired. Thank you. The case just argued will be submitted for decision.
judges: O'scannlain, Trott, Clifton